UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA


IN RE:

ANDERS H. KNUDSEN                                       Chapter 12
CYNTHIA J. KNUDSEN

        Debtors.                        Bankruptcy No. 05-03136M


<u>DECISION RE PLAN CONFIRMATION</u>

        Anders and Cynthia Knudsen seek confirmation of their

chapter 12 plan.  Objections were filed by the United States on

behalf of the Internal Revenue Service (hereinafter "IRS") and by

the trustee, Carol F. Dunbar.  Hearing on confirmation was held

July 12, 2006 in Fort Dodge.  Joseph A. Peiffer appeared as

attorney for Knudsens.  Martin J. McLaughlin, Assistant United

States Attorney, appeared for the IRS.  Carol F. Dunbar appeared

on her own behalf.  This is a core proceeding under 28 U.S.C. §

157(b)(2)(L).

        Anders (hereinafter "Knudsen") and his wife, Cynthia, filed

their chapter 12 petition on July 1, 2005.  Knudsen is 45 years

old.  He graduated from Iowa State University with a bachelor's

degree in agricultural business and minor studies in farm

management.  Cynthia has associates degrees in arts and in

science.  The couple has four daughters, ages 21, 17, 14 and 12.

The oldest daughter is presently a junior at Iowa State

University.  The middle girls will be in ninth and twelfth

grades.  The youngest daughter has a learning disability.  She

receives tutoring in addition to her public schooling.  The extra help is recommended by her school.  The family lives in Mitchell County, Iowa, near St. Ansgar.

Knudsen is a farmer.  He started farming part-time while in high school.  He purchased his first farm while in college.  When he graduated from college, he began farming 200 acres; he also had a small hog-operation.  He has farmed over the years with his younger brother, James.  The two men own various pieces of farm equipment together.  Knudsen owns several interests in farm real estate acquired over the years by purchase, inheritance, and through family exchanges.  Some of his interests are fractional, undivided remainder interests owned with siblings.  He and Cynthia own 160 acres in Mitchell County.  They own 80 of the acres as joint tenants with right of survivorship and 80 acres as tenants in common.  The 160 acres include the couple's 40-acre homestead, which has been claimed as exempt.

In the early 1990s, Knudsen enlarged his hog operation. During 1992-1993, he increased the sow herd to 250.  He built a farrowing house, and started selling feeder pigs.  Initially he hired others to fatten his hogs, but in the spring of 1995, he built his own finishing barn.  He built a second finishing barn in 1996.  By 1996 he was operating a farrow-to-finish operation and was selling his own hogs as his main source of income. During 1999, two occurrences of swine disease impaired the growth

2

and profitability of Knudsen's hog operation.  Beginning in 2000 and through 2003, Knudsen and his lender, the St. Ansgar State Bank, became concerned about the financial direction of his farming operation.  The bank was increasingly unwilling to lend money to finance it.

Knudsen investigated the idea of becoming a custom livestock operator.  In December 2003, he and Cynthia entered into two contracts to grow swine for Squealers Pork, Inc., an Austin, Minnesota corporation (SPI).  SPI was to provide grower pigs to be finished at the Knudsen facility.  Under the two contracts, Knudsens were to receive $14,338.00 per month.  The duration of the contracts was 10 years.  In addition to using his own hog facilities, Knudsen leased from his father a barn used for the gestation of SPI's sows.  The rent was $20,000.00 per year.  Because of concerns over disease, SPI required that Knudsen completely dispose of his own swine.

Knudsen decided to end his grain farming.  He leased out his 160 acres to a friend for cash rent of $20,000.00 per year.

Knudsen and Cynthia both work off the farm.  Cynthia is employed part time by a jewelry store located in Austin, Minnesota.  She earns about $7,000.00 per year.  In 2005, Knudsen began employment for a local radio station as on-air talent and as a salesman.  He is paid $28,000.00 in annual salary plus benefits, including health insurance.

3

During 2004, Knudsen sold the last of his breeding sows.
Also during 2004 he sold all of his slaughter hogs (fat hogs).
The fat hogs were those raised by Knudsen and sold in the
ordinary course of his business.  Knudsen used the proceeds to
pay the St. Ansgar State Bank, whose loan was secured by the
hogs.

Knudsen's change in operations allowed him to sell his
interest in some of the farrowing equipment that he owned jointly
with his brother.  During 2004 he sold his interest in seven
pieces of such equipment to his brother.  He also sold a
livestock trailer.

Knudsens filed their joint federal tax return for 2004 on or
after March 1, 2005.  Sales of "livestock, produce, grains, and
other products" were reported at $525,384.00 (exhibit 1, Schedule
F, line 4).  This figure included sales of slaughter hogs.
Knudsen's net farm income for 2004 was reported as $65,336.00
(exhibit 1, schedule F).  Gains from the sale of the farrowing
equipment to his brother and from the sale of the livestock
trailer were reported as ordinary gain on form 4797 and on line
14 of Knudsens' form 1040.  Income from sales of Knudsen's
breeding sows was reported as capital gain (exhibit 1, form
4797).  Knudsens' total tax for 2004, as shown on their initial
return, was $19,550.00 (exhibit 1, form 1040, line 62).

4

They filed an amended return on June 21, 2005, which showed their 2004 tax as $55,839.00 (exhibit 64).  The increased taxes resulted from a decision to revoke an election to treat certain hog building remodeling costs as expenses rather than to depreciate the costs over time.  The revocation had the effect of decreasing farm expenses for 2004, thereby increasing income.  See 26 U.S.C. § 179.  It also had the effect of increasing depreciation expenses for future tax years.

Under the initially filed return for 2004, there was self-employment tax of $9,232.00 (exhibit 1, form SE).  Under the amended return, the self-employment tax was $15,176.00 (exhibit 64).

Knudsens filed their chapter 12 bankruptcy petition on July 1, 2005.  They have filed a Fifth Amended and Substituted Chapter 12 Plan (doc. 136) and modified it twice to provide "technical amendments" (docs. 169, 162).

The essence of the proposed plan is to take advantage of 11 U.S.C. § 1222(a) as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23.  Section 1222 deals with the mandatory and permissive contents of a chapter 12 plan.

Prior to amendment, subsection 1222(a) provided that

[t]he plan shall ... provide for the full payment, in
deferred cash payments, of all claims entitled to
priority under section 507 of this title, unless the
holder of a particular claim agrees to a different

5

treatment of such claim.

11 U.S.C. § 1222(a)(2) (prior to amendment in 2005).

The section was amended by BAPCPA to state:

> The plan shall ... provide for the full payment, in
> deferred cash payments, of all claims entitled to
> priority under section 507, unless--(A) the claim is a
> claim owed to a governmental unit that arises as a
> result of the sale, transfer, exchange, or other
> disposition of any farm asset used in the debtor's
> farming operation, in which case the claim shall be
> treated as an unsecured claim that is not entitled to
> priority under section 507, but the debt shall be
> treated in such manner only if the debtor receives a
> discharge; or (B) the holder of a particular claim
> agrees to a different treatment of that claim.

11 U.S.C. § 1222(a)(2)(A) and (B).  Although many BAPCPA

amendments did not become effective until October 17, 2005, the

amendment to § 1222(a)(2) became effective on enactment of BAPCPA

on April 20, 2005.

As part of his plan to restructure his farming operation,

Knudsen plans to sell machinery and equipment and a remainder

interest in certain farmground, 120 acres of the 160-acre farm.

It is estimated that outside of bankruptcy, the sales would

generate significant capital gains.  Knudsens concede that in

order for their proposed chapter 12 plan to be feasible, the

income taxes resulting from the capital gains on the sales must

be given the favorable treatment provided by 11 U.S.C. §

1222(a)(2)(A), meaning that a portion of the income taxes must be

treated as unsecured debt rather than as priority debt to the

IRS, and that if they perform their plan successfully, the

6

unsecured portion must be discharged, including any penalties and
interest.  Also, Knudsens contend that the same favorable
treatment should apply to their prepetition restructuring sales
of fat hogs, sows, and equipment.

The disputes over confirmation in this case involve issues
as to which sales and their resulting taxes should receive
special treatment under section 1222(a)(2)(A), the extent of the
discharge of taxes if Knudsens successfully perform their plan,
and the method of calculation for separating priority taxes from
unsecured taxes in applying § 1222(a)(2)(A).  There is also a
disposable income issue over the payment of college expenses for
their adult daughter.

Knudsens contend that the 1222(a)(2)(A) treatment should
apply to prepetition and postpetition sales; that favorable tax
treatment should apply to assets normally sold to produce
ordinary income; that taxes from asset sales receiving favorable
treatment under 1222(a)(2)(A) should be calculated on a marginal
rate basis rather than a proportional basis to arrive at the
division between priority and unsecured tax debt; and that when
they successfully complete their plan, they should receive a full
payment discharge of any taxes treated as general unsecured debt
under 1222(a)(2)(A), including prepetition taxes and taxes
resulting from sales during bankruptcy.

The trustee objects to the proposed plan because Knudsens

7

propose to pay costs of their adult daughter's college education out of their income, in violation of the disposable income requirement of 11 U.S.C. § 1225(b)(1)(B).

The IRS objects to Knudsens' proposed treatment of federal income taxes under § 1222(a)(2)(A).  It makes the following arguments:

(1) favorable tax treatment under section 1222(a)(2)(A) does not apply to the Knudsens' prepetition sale of fat hogs because the hogs were not "farm asset(s) used in the debtor's farming operation" within the meaning of 11 U.S.C. § 1222(a)(2)(A) and the Internal Revenue Code;

(2) the allocation of income taxes between priority tax debt and "unsecured" tax debt under § 1222(a)(2)(A) should be made by prorating the actual tax for the period according to the proportions of income arising from the sale of farm assets used in the operation and income arising from all other sources.  IRS objects to Knudsens' use of a "marginal rate" method;

(3) as to prepetition income taxes, even if Congress intended a "reclassification" of a portion of priority tax debt to unsecured debt, the reclassified tax debt must still be paid in full under the "best interest" test of 11 U.S.C. § 1225(a)(4);

(4) as to prepetition income taxes, if Congress did not intend "reclassification" of priority tax debt to unsecured debt, then as priority tax debt under § 507(a)(8), it may not be discharged under § 1228(a);

(5) as to debtors' postpetition income taxes, the plan may not, as it proposes, pay any taxes as administrative expenses because such taxes are debts of the individual debtors, not taxes incurred by the bankruptcy estate; also, section 1222(a)(2)(A) treatment is inapplicable to Knudsens' postpetition taxes because such treatment applies only to priority claims, and postpetition taxes in chapter 12 are neither an administrative expense nor a prepetition priority claim;

(6) debtors' postpetition taxes may not be discharged

8

because such taxes are not administrative expenses under §
503(b)(1)(B).

<u>Issue (1) - Tax Treatment of the Slaughter Hogs</u>

Section 1222(a)(2)(A) provides beneficial tax treatment for
farmers in bankruptcy as to sales or other dispositions of "any
farm asset used in the debtor's farming operation."  IRS and
Knudsens disagree on whether that treatment applies to Knudsen's
prepetition sale of slaughter hogs.  Slaughter hogs were
historically raised and sold by Knudsen for the production of
farm income.  IRS argues that the phrase "used in the debtor's
farming operation" should be given the same meaning and treatment
as in 26 U.S.C. § 1231(b)(3), which provides capital gain
treatment for taxes arising from the sale of breeding livestock.
In section 1231 of the Internal Revenue Code, "property used in
the trade or business" is a defined phrase (<u>see</u> 26 U.S.C. §
1231(b)).  Section 1222(a)(2)(A) of the Bankruptcy Code uses the
term "any farm asset used in the debtor's farming operation."
IRS contends that the word "used" should be given the same
meaning in both statutes, limiting the favorable bankruptcy
treatment to sale of capital assets.

Knudsens disagree.  They contend that § 1222(a)(2)(A)
treatment should be extended to tax debt arising from the sale or
other disposition of any farm asset, when such disposition was
made in furtherance of restructuring the farmer's operation,

9

either before or after the filing of the chapter 12 petition.
This position is supported by the testimony of Knudsens' trial
expert, Dr. Neil Harl.  He testified that the sale of any farm
asset, if part of a restructuring plan, should qualify for the
favorable bankruptcy/tax treatment, even if the assets were
normally produced by the farmer to generate ordinary income.
Moreover, Dr. Harl would extend the favorable treatment to any
prepetition sale of such property if it is reasonably related to
the business's restructuring as proposed by the chapter 12 plan.
Dr. Harl suggests that favorable treatment should be permitted to
the extent that the sales are necessary to meet the
reorganization objectives of the plan.  He testified that the
amendment to § 1222(a)(2)(A) was the work of the Judiciary
Committee of the United States Senate, and he doubts the
committee was thinking of the term "used" in a tax context.

     I agree with the IRS on this issue.  Although the phrases in
§ 1231(b) of the Internal Revenue Code and in § 1222(a)(2)(A) of
the Bankruptcy Code are not the same, I conclude that the term
"used" as contained in both phrases should be given the same
meaning.  The lack of total equivalence in the phrases results
from the application of § 1231 to a wide range of business
enterprises, whereas § 1222(a)(2)(A) deals only with farming, and
therefore is more specific.

     The use of a term of art that has an accepted meaning in tax

law should be given the same meaning in a tax context in the

Bankruptcy Code.  <u>Colsen v. United States</u>, 322 B.R. 118, 122 &

n.5 (BAP 8th Cir. 2005), <u>aff'd</u>, 446 F.3d 836 (8th Cir. 2006).  I

infer that Congress in drafting § 1222(a)(2)(A) was considering

farm sales in the context of the Internal Revenue Code.

I find no decisions on this issue.  However, a respected

bankruptcy treatise is supportive on this point:

> The exception for claims owed to governmental units was
> enacted as part of the Bankruptcy Abuse Prevention and
> Consumer Protection Act of 2005 and has no counterpart in
> chapter 11 or chapter 13.  It presumably was intended to
> render capital gains taxes on disposition of farm assets
> into general unsecured claims for purposes of treatment
> under a chapter 12 plan.

8 Collier on Bankruptcy, ¶ 1222.02[2] at 1222-5 (15th ed. rev.

2006).

I conclude that the sales by Knudsens of slaughter hogs in

2004 do not qualify for § 1222(a)(2)(A) treatment as sales of

"farm asset[s] used in the debtor's farming operation."

<u>Issue (2) – Allocation of Taxes</u>

Knudsens and IRS disagree as to the method for allocating

tax claims between those attributable to the sale of farm assets

which qualify for beneficial treatment under § 1222(a)(2)(A) and

those entitled to priority status which are not attributable to

such sales.  IRS, understandably, makes its argument on this

issue without prejudice to its position that Knudsens are not

entitled to such beneficial treatment for all taxes regardless of the type of asset sold or the timing of the sale.

IRS argues that the appropriate way to allocate the taxes is to prepare a tax return which recognizes total income and all deductions and exemptions and calculates the income tax based on all taxable income. IRS would then calculate the percentage of total income attributable to sales of qualifying capital assets and the percentage of total income attributable to non-qualifying sources. The income tax would be divided according to these percentages. See IRS exhibit A (applying this method to Knudsens' 1040X amended return for 2004). IRS would add the total self-employment tax to the tax for non-qualifying income because it says the self-employment tax is not based on income from the sale of capital assets. Knudsens' 2004 tax returns show this to be so (exhibits 1 and 64).

IRS would next subtract any credits according to their relation to the sources of income. In the case of its example for 2004, it applied two credits to the non-qualifying tax calculation (tax withheld and fuels credit). IRS arrives at a net tax due for each treatment and then calculates the percentage of the tax attributable to qualifying and non-qualifying sources of income. In exhibit A, the "priority claim" is 82 per cent of the total tax, and the unsecured "general claim" is 18 per cent. IRS would then apply any payments on taxes for 2004 in accordance

with the percentage relationship of net tax due for qualifying
and non-qualifying income, yielding a tax balance for each.  IRS
calls this method a proration or proportional method.

Knudsens argue for a marginal rate method.  They would
calculate a tax return for all income, and then a second, pro
forma tax return removing all qualifying sales income.  The
Knudsens contend that this is a better method because it taxes
the non-qualifying income at lower marginal tax rates.  This
results in a lower tax for income not entitled to beneficial
treatment and likely makes reorganization more feasible,
furthering the intent of the amendment.  Knudsens would also
apply any and all payments on taxes to the non-qualifying tax,
the tax which would not be discharged unless paid.  No tax
payments for 2004 would be applied to the portion of the tax that
would receive beneficial treatment as unsecured debt under §
1222(a)(2)(A).

IRS points out that Knudsens' method eliminates the self-
employment tax because it reduces the amount of income on which
the tax is calculated.  This objection would appear to be moot
based on the court's determination that the benefits of §
1222(a)(2)(A) do not apply to income from the sale of all farm
assets but are limited to sales of farm assets used in the
debtor's farming operation within the meaning of 26 U.S.C. §
1231(b)(3).  Given that determination, I cannot predict whether

13

the allocation dispute would still be of consequence to the parties.

IRS otherwise objects to the marginal rate method for the very reason Knudsens support it--it calculates the remaining priority taxes at lower marginal rates.  IRS argues for a method that taxes all taxable income at the marginal rates that would be applicable outside of bankruptcy and then prorates the result. Neither party provides any other argument for the proposal.

I find that the proration method is the better method for determining what amount of tax qualifies for beneficial treatment under § 1222(a)(2)(A) and what does not.  It recognizes all income, deductions, exemptions, and credits in arriving at a tax and allocates according to the percentage of each type of income. It divides the actual tax without regard to which sales produced the last dollar of income.


Issue (3) – Prepetition Taxes and the Best Interest Test

IRS argues that the plan may not be confirmed because it fails to satisfy the "best interest test."  Section 1225(a)(4) states:

> Except as provided in subsection (b), the court shall
> confirm a plan if ... the value, as of the effective
> date of the plan, of property to be distributed under
> the plan on account of each allowed unsecured claim is
> not less than the amount that would be paid on such
> claim if the estate of the debtor were liquidated under
> chapter 7 of this title on such date.

14

11 U.S.C. § 1225(a)(4).   IRS contends that the portion of its
prepetition claim which is "reclassified" from priority to
nonpriority unsecured under § 1222(a)(2)(A) must still be paid in
full if it would have been paid in full AS A PRIORITY CLAIM in a
chapter 7 case (my emphasis).   IRS says that it is unclear
whether Congress intended that the claim be reclassified, but
that Congress's intent, as to this argument, is irrelevant.

     To support its argument, IRS points to Knudsens' liquidation
analysis at schedule 1A of the plan (doc. 136).   Under Knudsens'
liquidation analysis, priority tax claims would be paid in full
in a chapter 7 case.   <u>Id.</u>   However, under the proposed chapter 12
plan, nonpriority unsecured claims would not be paid in full.
<u>Id.</u>   Accordingly, IRS contends the plan may not be confirmed.

     For the purpose of plan confirmation, § 1222(a)(2)(A)
permits treatment of a portion of the IRS's priority claim as a
nonpriority unsecured claim.   The IRS is incorrect in its
argument that the plan treatment of such an unsecured claim must
be the same as the treatment of that claim as a priority claim
under a chapter 7 liquidation.   In applying the best interest
test to the portion of the IRS tax claim treated as unsecured, a
debtor satisfies the best interest test by showing that the
distribution to the IRS under the plan is the same as it would be
under a chapter 7 liquidation for the same treatment status--that
of an unsecured claim.

Section 1222(a)(2) still requires that all claims entitled to priority under § 507 be paid in full. Absent the agreement by a priority creditor to take less than payment in full, a chapter 12 debtor may not obtain confirmation unless the plan provides for payment in full of priority claims. Previous to BAPCPA, it has been the priority status of an IRS claim arising from a debtor's sale of capital assets that often prevented chapter 12 debtors from reorganizing. See In re Specht, No. 96-21022-D, slip op. at 4 (Bankr. N.D. Iowa Apr. 10, 1997) (Kilburg, J.) (tax effect of proposed disposition of land undermined plan's feasibility). This is the confirmation impediment that Congress sought to remove by amending § 1222(a)(2)(A). By treating the portion of the income tax resulting from the sale of capital assets as an unsecured claim, the farmer would no longer have to pay it in full to obtain confirmation. It would be passing strange if the confirmation problem merely shifted to a failure to meet the best interest test. It would do so if reorganizing farm debtors were required to pay all nonpriority unsecured claims the same percentage dividend that priority unsecured claims were paid in a chapter 7 case. I expect that in most cases such a reading of the section would eviscerate its benefit for farmers.

A better reading of the statute is to require the Knudsens to satisfy the best interest test by showing that the portion of

16

the IRS claim being treated as a nonpriority unsecured claim is not being paid less than it would be in a chapter 7 as a nonpriority unsecured claim.   Debtors provide four different liquidation analyses: 1A, 1B, 1C and 1D.   They contend that two of the analyses (1B and 1D) satisfy the best interest test. Analysis 1B deals with the sale of debtors' remainder interests in land conjoined with favorable tax treatment under § 1222(a)(2)(A); 1D deals with an inability to sell the remainder interests for an adequate price.   Either of these two analyses shows that plan payments on account of nonpriority unsecured claims, including the portion of the IRS taxes receiving such treatment under § 1222(a)(2)(A), would not be less than payment on account of nonpriority unsecured claims in chapter 7, including the portion of the IRS claim which is treated as nonpriority unsecured.   The plan does not violate the best interest test.

<u>Issue (4) -- Prepetition Taxes and Discharge</u>

IRS argues that if Congress did not intend that the IRS's prepetition priority tax claim be "reclassified" as an unsecured claim, then the court may not confirm Knudsens' plan because the plan provides for discharge of the prepetition priority taxes. IRS says it is "unclear" in BAPCPA whether Congress intended such a reclassification (IRS post-hearing brief, doc. 172, p. 7).

17

"Reclassification" is the IRS's term.  It does not appear in §
1222(a)(2)(A).  As I have stated in the preceding section, the
statute provides that a priority claim owed to a government unit
arising from the disposition of a farm asset "shall be treated as
an unsecured claim that is not entitled to priority under section
507."  11 U.S.C. § 1222(a)(2)(A).  I am not sure that an argument
over whether it is a "reclassified" claim is particularly
helpful.

IRS argues that if Congress did not intend a
reclassification, then Knudsens' plan is not confirmable because
it proposes discharge of a portion of the prepetition priority
tax claim.  IRS says such discharge is not permissible under 11
U.S.C. § 1228(a)(2).  That section excepts from discharge any
debt of a kind specified in § 523(a) of the Code, and such debts
include debts for taxes "of the kind and for the periods
specified in section ... 507(a)(8)."  11 U.S.C. § 523(a)(1)(A).

IRS's argument is clever, but I think it depends on a too
narrow reading of §§ 1222(a)(2)(A) and 1228(a).  Section
1222(a)(2)(A) permits debtors to treat government tax claims as
unsecured to the extent they arise from the sale or other
disposition of any farm asset used in the debtor's farming
operation.  A chapter 12 plan may provide such treatment, so long
as a debtor's plan complies with all other confirmation
requirements.  Knudsens' plan provides for § 1222(a)(2)(A)

18

treatment of the IRS's prepetition priority tax claim.

Section 1228 permits discharge of all debts permissibly provided for by the plan.  Section 1222(a)(2)(A) allows debtors to treat certain tax claims as unsecured rather than as priority tax claims regardless of their normal status under § 507(a)(8). The exception for debts of the kind specified in § 523(a)(1)(A) is, therefore, not applicable.  Because of § 1222(a)(2)(A) treatment, a portion of the IRS's prepetition priority claim is not, for confirmation purposes, a debt of a kind specified in § 507(a)(8).  The plan does not impermissibly seek to discharge debts excepted from discharge under § 1228(a)(2).

Issues (5) and (6)
Application of § 1222(a)(2)(A) to Postpetition Taxes
and Discharge of Postpetition Taxes

Knudsens' plan proposes sale during the case of farm assets which were used in the farming operation, including land, machinery, and equipment.  There is no dispute that these assets are capital assets rather than assets normally sold by Knudsen to produce income.  Knudsens contend that the tax generated by the postpetition sales of these assets should receive the favorable treatment provided by § 1222(a)(2)(A).  The IRS disagrees and objects.  Like most of the issues before the court in this proceeding, this issue implicates not only § 1222(a)(2)(A), but is also a feasibility issue under 11 U.S.C. § 1225(a)(6).

19

Knudsens concede that unless they obtain favorable rulings on most if not all of these tax/discharge issues under § 1222(a)(2)(A), the proposed plan cannot succeed.

IRS asserts that § 1222(a)(2)(A) effectuates no changes to the manner in which postpetition taxes are reported and paid in a chapter 12 case. IRS argues that the filing of a chapter 12 petition does not establish the chapter 12 estate as a separate taxable entity (IRS pre-trial memorandum, p. 4). This is true. 26 U.S.C. §§ 1399, 1398(a); see also 26 U.S.C. § 6012(b)(4) (treating as separate entities only the estates of individual chapter 7 or 11 debtors). Chapter 12 debtors can continue to incur tax liability on income earned during the chapter 12 case. IRS argues also that there is no provision in chapter 12 similar to 11 U.S.C. § 1305(a)(1) regarding IRS's filing of postpetition tax claims. This also is so. Moreover, a debtor cannot compel a governmental unit to file a postpetition tax claim.

IRS contends that because the estate does not incur postpetition tax liability, taxes incurred by the individual chapter 12 debtors during the case do not give rise to administrative claims under 11 U.S.C. § 503(b)(1)(B). That section states:

> [T]here shall be allowed administrative expenses ... including--
> ...
> (B) any tax--
>   (i) incurred by the estate, except a tax of a kind specified in section 507(a)(8) of this title.

20

11 U.S.C. § 503(b)(1)(B) (2005, pre-BAPCPA).

In addition to arguing the estate is not a taxable entity in a chapter 12, IRS argues also that because confirmation of a plan vests all property of the estate in the debtor, taxes incurred after confirmation are not incurred by the estate. IRS cites In re Gyulafia, 65 B.R. 913, 916 (Bankr. D. Kan. 1986), for this proposition.

IRS points out also that postpetition taxes are not priority claims under § 507(a)(8). I agree. Taxes given priority under § 507(a)(8) are those derived from prepetition income. IRS concludes that because postpetition taxes are not administrative claims under § 503(b)(1)(B) nor priority claims under § 507(a)(8), they are not entitled to be treated in the plan as unsecured claims under § 1222(a)(2)(A) or to be paid through the plan, either as priority or nonpriority unsecured claims.

Regarding discharge of debts in chapter 12, IRS cites § 1228(a) which in pertinent part states that, subject to certain specified exceptions,

> the court shall grant the debtor a discharge of all
> debts provided for by the plan allowed under section
> 503 of this title or disallowed under section 502 of
> this title....

11 U.S.C. § 1228(a). IRS contends that based on the foregoing legal premises, Knudsens may not obtain confirmation of their plan because it proposes to discharge portions of postpetition taxes incurred by them as individuals.

21

IRS summarizes its objection to the plan treatment of postpetition taxes as follows:

> In the present case, Debtors are attempting to pay the postpetition taxes, as administrative expenses, through their Chapter 12 Plan and to discharge their postpetition tax liability as part of their Chapter 12 Plan. But, because the postpetition taxes would not be "incurred by the estate,["] the postpetition taxes would not be pre-BAPCPA administrative expenses and would not be an "allowed" expense under pre-BAPCPA § 503.

IRS brief, doc. 172, p. 14. I disagree.

Although confirmation of a plan may, under § 1227(b), vest "all of the property of the estate in the debtor," that does not mean the estate ceases to exist, although it may give the debtor control of the property. See Security Bank of Marshalltown, Iowa v. Neiman, 1 F.3d 687, 691 (8th Cir. 1993) (estate continues to exist after confirmation of chapter 13 plan). Knudsens' estate may continue to hold property that is necessary for the effectuation of the plan, and debtors may sell the estate property in the performance of the plan.

Also I disagree that taxes incurred postpetition by the individual debtors cannot be administrative expenses for the purposes of payment under the plan. In a bankruptcy case, the payment of the tax imposed against a debtor may still be "divided into separate components in accordance with the bankruptcy laws determining the priority of payment of those claims." Missouri Dept. of Revenue v. L.J. O'Neill Shoe Co. (In re L.J. O'Neill

22

Shoe Co.), 64 F.3d 1146, 1152 (8th Cir. 1995).  I rely on the
Circuit Court's decision in O'Neill Shoe Co., a chapter 11
corporate case, in determining that although Knudsens' chapter 12
estate is not a separate taxable entity, Knudsens' plan may
provide for payment of taxes arising from income earned after the
filing of the petition, and such taxes may be treated for
distribution purposes as administrative expenses under 11 U.S.C.
§ 503(b)(1)(B).  Moreover, the plan may provide for treatment of
a portion of these taxes as unsecured debt under § 1222(a)(2)(A),
and upon entry of a discharge order, such taxes, including
penalties and interest, would be discharged under 11 U.S.C. §
1228(a) to the extent they are treated as unsecured.

   The discharge provision of chapter 12 states that "after
completion by the debtor of all payments under the plan ... the
court shall grant the debtor a discharge of all debts provided
for by the plan allowed under section 503 of this title or
disallowed under section 502 of this title...."  There seems to
be a comma missing between the phrase "all debts provided for by
the plan" and the phrase "allowed under section 503 of this
title."  I read the sentence to mean that debts allowed under
section 503 are one category of debts dischargeable in chapter
12.  See 8 Collier on Bankruptcy ¶ 1228.02[4][a] (discussing
scope of chapter 12 discharge).

   I conclude that a chapter 12 debtor may treat postpetition

income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under section 503 and that the plan may propose payment of such expenses by the estate.

I conclude also that the portion of such taxes which may be treated as unsecured under § 1222(a)(2)(A) may be discharged, including any accruing penalties and interest. As has been discussed, § 1222(a)(2)(A) permits treatment of § 507 claims owed to a governmental unit as nonpriority unsecured claims. Section 507 claims include administrative expenses allowed under § 503(b). 11 U.S.C. § 507(a)(1) (pre-BAPCPA). Section 503(b) administrative expenses include taxes incurred by the estate. Finally, treating such taxes as unsecured permits their discharge without the requirement of payment in full.

I agree that the statute is ambiguous. But I believe that Congress intended to help farmers reorganize and stay in business by lessening the burden of prepetition and postpetition taxes arising from the sale of assets used in the farmer's farming operation, assets such as equipment and land. Congress placed the entire burden for such intention on § 1222(a)(2)(A). One respected treatise has described §1222(a)(2) as follows:

> The second requirement of section 1222(a) is that the plan provide for payment in full, in deferred cash payments, of all priority claims under section 507, subject to two exceptions. The first is if the holder of the claim agrees to accept less favorable treatment. The second concerns a claim owed to a governmental unit

that arises as the result of a sale or other
disposition of a farm asset used in the debtor's
farming operation.  Any such claim shall be treated as
an unsecured claim that is not entitled to priority
under section 507, but only if the debtor receives a
discharge.

The exception for claims owed to governmental units
was enacted as part of the Bankruptcy Abuse Prevention
and Consumer Protection Act of 2005 and has no
counterpart in chapter 11 or chapter 13.  It presumably
was intended to render capital gains taxes on
disposition of farm assets into general unsecured
claims for purposes of treatment under a chapter 12
plan.  This may cause issues with respect to sorting
out what portion of a claim held by a governmental unit
is attributable to disposition of a farm asset.
Another potential issue concerns the scope of the
debtor's discharge.  If the intent was to treat such
claims as general unsecured claims for plan purposes,
the intent was probably also to render them subject to
the discharge, although no corresponding change was
made to section 1228.

8 Collier on Bankruptcy ¶ 1222.02[2].

Legislative history is also helpful on this point.  In 1999,

Senator Charles E. Grassley introduced S.260 into the 106th

Congress.  This bill proposed an amendment to § 1222(a)(2)

identical to the change made by BAPCPA.  Senator Grassley made

the following comments on this aspect of the bill amending §

1222(a)(2):

"Safety 2000" also helps farmers to reorganize by
keeping the tax collectors at bay.  Under current law,
farmers often face a crushing tax liability if they
need to sell livestock or land in order to reorganize
their business affairs. ... Under the bankruptcy code,
the I.R.S. must be paid in full for any tax liabilities
generated during a bankruptcy reorganization.  If the
farmer can't pay the I.R.S. in full, then he can't keep
his farm.  This isn't sound policy.  Why should the
I.R.S. be allowed to veto a farmer's reorganization

25

plan?  "Safety 2000" takes this power away from the
I.R.S. by reducing the priority of taxes during
proceedings.  This will free up capital for investment
in the farm, and help farmers stay in the business of
farming.

145 Cong. Rec. S750-02, 1999 WL 20426 (Jan. 20, 1999)(statement

of Sen. Grassley on S.260).  This history indicates that §

1222(a)(2)(A) was intended to apply to sales during the chapter

12 proceeding.

I conclude that Knudsens may pay through the estate, as

administrative expenses, income taxes incurred by them during the

pendency of the case, that they may treat a portion of such taxes

as nonpriority unsecured claims under the plan pursuant to §

1222(a)(2)(A) and that such nonpriority unsecured taxes incurred

postpetition may be discharged with prepetition unsecured debts

after completion of the plan.


Issue (7) -- Payment of University Tuition

Knudsens propose to pay projected disposable income to the

trustee.  In calculating that income, they show as an expense

university tuition costs for their adult daughter.  The trustee

objects, arguing that tuition is not a reasonable and necessary

expense for the "maintenance or support of the debtor or a

dependent of the debtor...."  11 U.S.C. §§ 1225(b)(1)(B) and

(b)(2)(A).  I agree.  There has been no showing that the tuition

is a necessary expense even if Knudsens' daughter arguably

26

remains a dependent.  The plan may not be confirmed because it does not comply with § 1225(b)(1)(B).


Conclusion

Knudsens have presented a plan with several variables as to prepetition and postpetition sales of property and as to the tax treatment of those sales under 11 U.S.C. § 1222(a)(2)(A). Employment by debtors of any of these variations depends on the court's ruling as to the dischargeability of any portion of resulting income taxes from such sales.  My rulings on the proposed plan and the objections to it have not entirely favored either the debtors or the IRS.  From the arguments of debtors, I believe that my rulings against certain of their positions make the plan as proposed unconfirmable.  This is certainly so as to the trustee's objection on projected disposable income.

IT IS ORDERED that confirmation of the debtors' Fifth Amended and Substituted Plan filed June 8, 2006 (doc. 136) and modified by two "technical amendments" filed on July 11, 2006 is denied.

DATED AND ENTERED   November 20, 2006.

William L. Edmonds, Chief Bankruptcy Judge